You may begin. Good morning, Your Honor. My name is Amber Phillips, and I represent appellant Hilyale Makor. I'd like to reserve five minutes of rebuttal time, if I might. You'll need to watch the clock, but I'll try to help you. I will. Thank you, Your Honor. Your Honors, in this case, Mr. Makor seeks for this court to reverse the district court's order granting appellee BNSF's motion for summary judgment and denying plaintiff's motion for summary judgment as moot. We request that this case be remanded to the district court so it may proceed to trial. The essence of this case is about the broad protections that California provides disabled employees. California is unique in its protections. In the legislative findings and declarations of the FEHA, the California legislature makes clear that it's intending to provide protections that are more expansive and independent of the ADA and that the ADA is always acted as a floor for the protection of disabled employees in California. I'd like to have a couple of questions for you, so let's get right to it. Let's just assume that BNSF had actually reached out to Mr. Makor, because this is one of your major complaints. Before replacing him in October, what evidence is there or do you have that Mr. Makor's physicians would have been able to provide a clear prognosis or return date? Because I didn't see any. Well, I would say, Your Honor, that, yes, one of our major arguments is that BNSF was obligated under the California Code of Regulations and obligated under the case law to engage with Mr. Makor upon the expiration of his FMLA leave. If they had done so according to their duties and said, Mr. Makor... Even though there was an uncertain date of return and no date of return. I would say, Your Honor, that if BNSF had reached out to Mr. Makor and said, as they are required to do under California Code of Regulations 11069B, we need a specific date, we want to know how to fill your position, we need a specific date, that Mr. Makor's physician could have then estimated that time and said, well, I know for sure he'd be able to return at this time. But it's true you didn't offer anything in the case below to show that if they had, that he would have returned on such a date. Because the evidence is actually to the contrary. It sounds like the doctor didn't give a date and he was not doing very well. Well, no, Your Honor. I would say that the doctor's note that was submitted in September of 2012 actually indicated that Mr. Makor's condition was improving. Well, he says he's getting better. If you're talking about the September 16th? Yes. Okay. He's getting better, but he's still being treated, does not include a return or reassessment date, but he gets upset when discussing return to work. Correct, yes. But it does indicate that his condition is improving. I think that we've also, we also, yes. But then I think you're also, though, challenging that they didn't reach out after October 20th or January 6th. Correct. And if we look at what was being communicated at that point, it says the physician sends a note that Mr. Makor is totally incapacitated until at least January 2013, and then in January 6th, 2013, it says the physician sends a note that Mr. Makor is totally incapacitated until at least March 2013. And so I'm not necessarily disagreeing with you that there could be an obligation on the employer to reach out, but it seems like the case law that's out there seems to suggest that that would happen when they get some sort of statement that says that he might be, or that there would be evidence that he would be coming back relatively soon or sometime certain. And there was no evidence of that submitted at this point in your case down below. Well, Your Honor, what I would say about that is that this court has even held in Dark v. Curry County that an employer was obligated to at least consider a leave of an undetermined time, that extended leave periods or, sorry, that repeated requests for leave don't automatically render the leave indefinite, and that had BNSF reached out to Mr. Makor and stated, we need a firm return to work date, that Mr. Makor's physician would have said, well, I know it will be 10 months from now. Whatever that padding would be for a firm return to work date if that was required. But I don't even think under the case law that's required, as we pointed to in our brief. And I would also say that the BNSF, they did not make the decision to fill Mr. Makor's position at the expiration of his FMLA leave because they didn't understand his leave or they were confused. That is what they do as a matter of policy. They do not have any procedure in place to interact with employees that are coming up to the expiration of their FMLA leave, regardless of what their doctor's notes say. Their policy, there is a huge gap in their policies that negate or ignore their obligations under California law. But you do, I guess, concede that Mr. Makor has not provided any evidence that the duration of his leave would somehow have been more concrete if BNSF had only contacted the physicians. No, I don't concede, Your Honor. I mean, show me where you have offered that then. Well, I would say that if BNSF – But you didn't offer a proffer of a doctor or anything like that down below, did you? That if we would have contacted me, I would have been able to tell you what date he returned. Well, we know that, Mr. Makor. Did you offer that? What we offered were the doctor's notes that were actually submitted to BNSF. I know, but did you offer any kind of proffer? I think that's a yes-or-no response. As to what? A yes-or-no response. Well, can you repeat the question? Yeah. Did you make a proffer down below that if the BNSF had contacted a doctor, the doctor would have said yes, I would have been able to tell him that he was doing better or whatever and that he'd be able to return by a certain date? No, we did not make that exact proffer. But what we contend, what we know to be true, is that the California law requires that there be an interactive process, that there be a meaningful exchange between the employer and the employee to clarify if there's any question, if the employer has any question. If we look at the regulations – No evidence whatsoever, so long as the employer doesn't take that first step. No. That's your submission. No, my submission, no. What we are stating is that what Mr. McCore submitted were repeated leave notes, requesting extensions of leave. That's what we offered. And under the case law that we cited in the brief, and according to this court in Dark v. Curry County, we believe that the law shows that just because there were repeated requests for leave, as in Garcia-Alao. I think you answered me no, but then your explanation is all about yes, that you had no duty in the context of the litigation to come forward with any evidence to suggest that the interactive process would have yielded anything beyond what was yielded in the repeated notes that he's not doing well and no indication of when he can come back. Well, no. In other words, my question tried to focus you on what your obligation was in the context of the litigation. I think our obligation in the context of the litigation was to show that there was, that Mr. McCore, there was at least a genuine issue of dispute regarding Mr. McCore, the ability to accommodate Mr. McCore. And I think that we did show that. We showed that Mr. McCore and his health care providers interacted with BNSF and MetLife in good faith. He repeatedly reached out. They did not reach out. It's not in dispute that they did not reach out to Mr. McCore. What is in dispute here is that, or not even dispute, and what's also not in dispute is that Mr. McCore reached out to BNSF repeatedly and provided return-to-work notes to extend his leave. Let me ask you about something else. Given that Mr. McCore returned to work without restrictions, I'm trying to understand why you're arguing that he was entitled to reassignment as accommodation if he was ultimately returned to work without restriction. Well, I think we have to go back first and say that leave is a reasonable accommodation. We know leave to be a reasonable accommodation, and that accommodations, a reasonable accommodation is only when it's effective in returning. And we also know that leave under California law requires holding the job open. However, if BNSF is saying that Mr. McCore But ultimately when he came back, do you agree the doctor said he's coming back without restriction? But that does not, Your Honor, that does not mean that Mr. McCore is no longer disabled under the law. And actually the law is clear from the very statute. It says that an employee is a qualified individual when they're able to perform the essential duties of their job with or without accommodation. It takes that just because an employee is returned to work. Without restriction. Without restriction or without the need for, without restrictions. Yeah, that does not necessarily render them not disabled under the law. But does it render them needing an accommodation? Yes, it does. How can you come back to work without restriction and yet require an accommodation? You can be disabled, sure, but not all disabled employees require accommodation. Well, because he didn't, first of all, he didn't come back, he came back to a job. He didn't have a job anymore. And BNSF has like taken contrary positions, I will say. On one hand, they say there was no obligation for them to reasonably accommodate Mr. McCore. And on the other hand, they say, oh, no, we did reasonably accommodate Mr. McCore by providing him all the leave he requested. Well, leave is not effective in returning a person to work if they don't hold the job open or if they don't reassign the person to a vacant position. Which, and I will say, as of January 17th when they subjected this, when they subjected Mr. McCore to the 60-day find-your-own-job-or-be-terminated policy, they knew he was still on leave, they knew he was disabled, they knew he required accommodation, they knew they did not hold his job open. And that at that time, yes, they were required to interact with him and reassign him to vacant positions that we know were there for which he was qualified, as is rendered by their own evidence. Did you want to reserve the balance of your time? I'm sorry. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. Ronald Levotny for BNSF Railway. I believe the Court's questions hit the nail on the head in terms of this issue pertaining to this trainmaster job being filled and the fact that he had no reasonable accommodation that was available for that and that the railroad had no obligation to do anything at that time. Mind you here, we're not talking about an accommodation of a leave, which he received. He received an extended leave. We're talking about a proposed accommodation that came up for the first time in summary judgment in this case, wasn't pled, wasn't charged, to the effect that somehow we had the obligation to keep the trainmaster job open, which he was totally incapacitated from performing. There is no authority saying that we had to do that. There is no authority saying that my client had to call his doctor to discuss it. Well, let's talk about that in a little bit. You know, if BNSF wasn't sure about Mr. McCord's return date, shouldn't the company have asked before unilaterally deciding that he was on an indefinite leave? Why didn't you do that? I mean, how hard is that to pick up the phone? There's no obligation, Your Honor. People have four months of job protection, and that was a hard-fought gain 25 years ago. They have four months of protection. When they're not back by then, an employer has a right to fill the job. There is no obligation anywhere in the law to call anybody's doctor. So what, in your view, does engage in the interactive process mean? Well, Your Honor, I think it means – Especially when you have a record like this. I'll reference it. I think this is the best definition on that issue that I could sort of pull out of the record. 11069B3 of the regulations. The employer shall initiate the interactive process after exhaustion of FMLA leave. After exhaustion, it says. After. If the employee's health care provider indicates further accommodation is still necessary for recuperative leave. He didn't do that. There was no recuperative leave. He was depressed and unable to work, unable to return to work. In fact, all the evidence is that from that point, he contended that he couldn't work even further, that he was even more depressed, that his disability continued even past December because his short-term disability benefits, mind you, the full pay for six months, which he wanted at that point in time, that was terminated on December 7th of 2012. And he appealed that determination. He said he was still totally disabled at that time. Now, the construct that I think the law imposes here is, and it's the Scotch v. Art Institute case and it's the not offeror of cases. Look, in this situation, you determine whether there was a reasonable accommodation available under those circumstances. And the law under the ADA is the same. If you can't do that, there was no duty to engage in the interactive process. It's just that simple. But at what point are we talking about? Well, at the point all the way, Your Honor, from October through March of the next year. He was on an indefinite leave with no, and this is the key here. Counsel is wrong in saying there's some kind of duty to keep a job open indefinitely. The Dark case, which she cites, actually said that a recovery time of unspecified duration is not a reasonable accommodation where the employee will not be able to return to his former position and cannot state when and under what circumstances he can return to work at all. That's one of the two key cases they rely on in this case, Dark, one of the Ninth Circuit cases. And I think the law is pretty clear, the EEOC guidelines as such, that someone needs either an actual or approximate date of return in order to trigger this accommodation obligation because at that point the employer has something to work with. We know when the person is expected to be back. We can see, we can vest available job opportunities and positions that might be there for the person given their limitations or whatever. And at that point we can look at what it is we legally have to do. There was discussion in the briefs about undue hardship. I didn't hear anything about it today. But, you know, undue hardship is completely irrelevant because you only look at an undue hardship in the context of a specific proposed reasonable accommodation. And there wasn't any here except for ongoing leave. Counsel is correct. He kept extending the leave. His doctors kept extending the leave. Is there, does the law contemplate, I suppose this is sort of a silly question maybe, but does the law contemplate a therapeutic effect from notifying an employee that we're going to fill your position? I've never seen that, Your Honor, in any of the case law. Might that inform the duty to be interactive? In other words, I mean it's not silly to think that an employee who's told, okay, you've got five weeks of leave left, we've begun, we've advertised your position because we have no reason to think that you're going to be prepared to come back. By obtaining the full-time pay and leave provided by the short-term disability plan, he is put directly on notice of that. It says right in the plan that we have the right to fill your position after 12 weeks. No surprise that that happened here. That's a form letter that went out. And that's the problem with it, isn't it? I mean arguably it's a form letter. No, not at all, Your Honor. No, because if his doctor had said on September 6th. A form letter really is a little different from your supervisor calling you on Tuesday morning saying, okay, here's where we are and here's where we're headed. I'm not suggesting that the law imposes this. I'm just really asking the question. No, no. I think that, look, it's a form letter in that you look at different persons, different dates, different circumstances. It's just a letter that's used in connection with the short-term disability plan. But, no, I think what you're talking about is perhaps the more common situation of someone saying, okay, look, the person can be targeted to return to work November 2nd. Okay? All right? Or at some point in the following month. All right? That happens often. And then they can have that discussion. Then they can look at what's going on. The railroad might very well have still filled that position. You understand there are many, many train masters in a railroad. Or it may have offered him something else. Or it may have offered him a completely different job. But we didn't know anything about his ability to return to work at that time. And that's what the case law is clear about in terms of us not having any obligation to do anything in that respect. But you extended it. Let me make sure. I'm not sure I understand what it is that you are being asked to do. But I want to understand what you did. So you extended his leave after giving him all the paid leave that you were required to give him, correct? His leave was extended until he returned to work March 17th, 2013? Yes. But you had filled his position as you were authorized to do? Correct. So you left it open as long as you should have? Well, Your Honor, it wasn't his position. Filled the train master position that he occupied in San Bernardino on October 17th. That's our position. But you told him that he could apply for other positions. That's right. And that's pursuant to the short-term disability plan, which is a neutral, non-discriminatory policy, much as the policy was in the Raytheon-Hermandez case, which is a legitimate. Is this a bargain for plan? No, Your Honor, I think it's an employer-adopted plan. There's short-term disability and then long-term disability plans if they need it. I think the short-term plan is just payroll funded, and long-term plan is through a carrier like Medlife. But, no, it's a plan where people were criticized somehow in the briefs for having some kind of gotcha system of putting people on leave and then firing them. But, no, this person actually got the leave that allowed him to come back and look for jobs under circumstances when he otherwise could have been fired. And what it is, it gives people income protection up to six months and leave of absence as needed, and even appeal rights if they contend that they're still disabled. And then at the end, they're given this 60-day unpaid leave of absence in his situation and allowed to access the available positions at the railroad. As the court suggested, he wasn't disabled at the time. All of the preferential reassignment cases that exist in California, Jensen, Spitzer, all those cases dealt with people who had severe limitations and disabilities, and the employer found something consistent with those limitations pursuant to this preferential reassignment. And there weren't any limitations here? He had none. He absolutely had none. So what further accommodation could? He wasn't entitled to one, Your Honor, at that point. We don't contend that we had to accommodate him at that point. I think the argument in the brief was that to the extent there was some conceivable obligation that we did so by this reasonable procedure. But no, he was not a qualified individual with a disability, either at the time the trainmaster position was filled or at the time he was terminated. But there were trainmaster positions available, just not the one that he had before. There were, Your Honor. He applied for supervisory positions. Is that right? Well, I think it would be more accurate to say he applied for computer professional and systems design kind of positions that were completely different from the trainmaster job he had before. That's what he did. Were the trainmaster jobs that were available in other places? There were two of them in Barstow and Bakersfield for that period of March and April, which we put into the record. And also, you understand, the process is one thing I wanted to say, too, in opposition to this concept that somehow we retaliated against him, which we didn't, gave him all the leave he wanted to have, and did not discriminate him at all based on his disability. He was terminated instead because he could not place himself on a job. But had there been any interest in finding such a job, what happened? The only day on record that we have of him actually trying to find a job completely nullifies any conceivable retaliatory intent. He calls George Hill and someone back in Texas, Sheila Breckenridge on that day, and says, Hey, I'm having trouble getting on the system to look for jobs. And within minutes, they help him. So what does that tell you? Does that suggest maybe that if he found a job, a trainmaster job somewhere, and calls back and says, Hey, can you help me with this, that they might have assisted him in making the application or something? Sure it does. Sure it does. I mean, that's the whole point. The whole point of this is people have been out on leave. They don't have their old jobs anymore. They have to tell us, that is, what they're interested in doing. And by the way, too, the kicker to all this, I mean, the key point is, had he come back with some limitation like, Gee, I had depression, I need a less stressful job, something like that. Or I need medication. There's residual effects of my disability under that regulation. Sure there's an obligation to accommodate. Absolutely. And we showed how we have reasonable accommodation practices for that. There's a button you push on the website to access the reasonable accommodation materials. And that is something that was available to him. But he did not access them. He had no interest in accessing them, because unlike his attorneys at this point, he doesn't contend he was disabled. He understood and testified that he was fully able to resume whatever job duties he might be offered or able to apply for. So he quite simply was not a qualified individual with a disability in that situation. And that means he's not entitled to protections of the law. That means he has no claim for disability discrimination or retaliation or failure to reasonably accommodate or failure to engage in the interactive process. And the district court properly granted assembly judgment on all of those claims. Thank you. Thank you, Your Honor. Hello again. I'd like to address some of the points that Mr. Novotny brought up. One is that Mr. Novotny was claiming that they are only entitled to keep an employee's job open under the FMLA. Essentially, that's what he's claiming, is that there was a hard-fought battle in Congress for FMLA leave, which is actually 12 weeks, and that that's all that's required of an employee as far as holding a job open. That is not true. The FEHA is more expansive. First of all, the FMLA was enacted to provide leave for caregivers. It wasn't even necessarily enacted to provide leave for the individual. However, FEHA is much more expansive, and it requires – and holding a job open, job-protected leave is a reasonable accommodation. Well, are you claiming – I just don't – I must be missing something important here. Are you claiming that they didn't keep the job open for the time that they were required to leave it open? Correct, Your Honor. I'm saying that they did not leave the job open for – that they knew that Mr. McCorr was requesting job-protected leave and that the whole point of providing a leave – there would be no – so the bigger picture here, Your Honor, is that leave is only a reasonable accommodation if it enables the employee to resume the essential – to perform the essential functions of their job. If they are not allowed to resume a job, if they're not allowed to be returned to work after that leave expires – So your position is that on March 17th, his position still had to be held open? In the alternative, Your Honor. I'm saying that or in the alternative. If BNSF – that's a question of undue hardship. Filling the job, not – the regulations make clear that when the employer is going to reject the employee's requested accommodation, when they're going to reject that, they have to – they have to – the words are shall – they engage in – they shall give it due consideration, the requested accommodation, and if they decide to reject it, they have to interact with the employee to determine other forms of accommodation that might be available. Now, BNSF, there's no question that they didn't do that. And so my response to you, Your Honor, is that, yes, one of the reasonable – the reasonable accommodation Mr. McQuarrie was requesting was job-protected leave. If BNSF had engaged in undue hardship analysis, which they didn't because they didn't feel they had any obligation to, and said, hey, you know, it's too burdensome for us to keep this job open. So I think I understand. So from your position, it's either indefinite leave or interactive process to avoid the obligation to provide indefinite leave as a reasonable accommodation. No, Your Honor. What did I just say that was incorrect in your theory? So we're not claiming – first of all, we're not claiming Mr. McQuarrie was on indefinite leave. No, of course he wasn't. But you're claiming, I think, if I understand, that the obligation was to provide indefinite leave. No. The obligation was to – was if that – they could not provide the requested accommodation. Which is indefinite leave. Well – Then they've got to engage in – Not in this case, Your Honor. We're saying not in this case. But to Your Honor's broader point, the regulations make clear in 1106 – I can point you to the exact – 11069 that it doesn't say the employees requested reasonable accommodation. It just says the employees requested accommodation. The idea behind the interactive process and reasonable accommodation, undue hardship, is that there will be a meaningful dialogue between the employer and the employee to determine what accommodations – Accommodation to what? What was his disability on March 17th when he came back? So he was suffering from depression and anxiety. And we know the cases hold, the cases Maharaj and Arteaga hold, that a person doesn't just lose their disability status because they return to work without restrictions. I will also say to the court that in Garcia Ayala, the court held that some – that some of these disabilities, that people know that some of these disabilities aren't defined precisely by, I broke my leg. I have to – I will – You need to wrap up. Yes. So do you have a concluding statement? Yeah. My concluding statement is we believe that there – that the record shows there is – it's fraught with disputed issues of material fact. And we believe that the reasonableness of an accommodation is a jury question and that all of these things, all of Mr. McCord's causes of action, should proceed to trial so that the fact finder may make those determinations. Thank you very much. Thank you. Thank you both for your arguments here today. Thank you, Your Honor. Appreciate it. It's been an honor. Thank you. Thank you. The case of Maker v. Burleson Northern Santa Fe Railroad is submitted.
judges: Schroeder, Murguia, Davis